**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

Eastern District of Kentucky
**FILED**

SEP 3 0 2008

AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

**CIVIL ACTION NO. 05-204-DLB**

**SOUTHERN APPALACHIAN**
**COAL SALES, INC., ET AL.**                                          **PLAINTIFFS**

**VS.**                              **OPINION AND ORDER**

**CITIZENS BANK OF**
**NORTHERN KENTUCKY, ET AL.**                                       **DEFENDANTS**

\* \* \* \* \* \* \* \* \* \* \*

This case is before the Court on dispositive motions.  Each of the three remaining

Defendants[1] moves the Court for summary judgment on all claims asserted against them

by Plaintiffs.  The motions have been fully briefed[2] and are ripe for decision.  Having

reviewed the parties' filings and the record, and being duly and sufficiently advised,[3] the

Court concludes that summary judgment is warranted.  Therefore, for the reasons set forth

---

[1] Former Defendants Carcoal N.A. Inc. and Cardigan Coal and Coke Corporation, now defunct corporate entities that were owned and operated by Defendant Charles Welsh, have been dismissed without prejudice by Plaintiffs, pursuant to separate order entered contemporaneously herewith this Opinion and Order.

[2] Plaintiff Cook & Sons Mining Co. has moved to strike Defendants' filings in reply to Plaintiffs' responses (mistakenly labeled as replies) to Defendants' summary judgment motions. (Docs. #117 & #122).  Plaintiff contends reply filings were not provided for in the Court's scheduling orders on dispositive motion filings.  However, those orders provided for initial filing deadlines for dispositive motions, then later granted an extension for Plaintiffs to file responses.  The sequence and timing of motion filings are addressed by local rule; the Court's Orders do not change or dispense with the opportunity for filing of a reply as otherwise provided by local rule.  Plaintiff's motions will therefore be denied, as will Plaintiff's request to file a response to Defendants' replies, as sur-replies are not a part of motion practice provided for in the local rules.

[3] Certain of the parties requested the opportunity to present oral argument on the dispositive motions.  Based upon the record and briefing, however, the Court concludes oral argument is not necessary for its adjudication of the pending motions.

below, Defendants' motions will be granted.

## I. FACTUAL BACKGROUND

Plaintiff Southern Appalachian Coal Sales, Inc. (Southern Appalachian) and Intervening Plaintiff Cook & Son's Mining Co. (Cook & Sons) deal in coal. So did Cardigan Coal and Coke Corporation (Cardigan).[4] Plaintiffs were two of the companies from whom Cardigan purchased coal for resale.

Southern Appalachian's President and sole owner is Kenneth Daniels. Cardigan's President and sole owner was Defendant William Welsh. Daniels has known Welsh since the 1980s, when he formerly had business dealings with him. Daniels' company started selling coal to Welsh's company sometime in the 1990s. Michael Cook was the President of Cook & Sons, a company started in 2000 that was owned by Cook and his siblings until it went bankrupt in 2004. Cook & Sons started doing business with Cardigan in the summer of 2002.

The financial side of buying and selling of coal can be done in various ways. Purchase and payment can be done unsecured, with the purchaser simply being invoiced by the seller and payment due within a certain period of time. Coal purchases can also be done on terms imposing methods to guarantee payment of the purchase price. This includes, for example, using letters of credit or escrow agreements.[5] Welsh testified that

---

[4] The Complaint names as Defendants Cardigan and Carcoal N.A. Inc., both now defunct corporations owned and operated by Defendant Welsh, and both now dismissed by separate order. The case record reflects the parties primarily referred to Cardigan when discussing the businesses run by Welsh, a practice that will also be used by the Court.

[5] The briefing explains that a sale on escrow occurs when the purchaser of the coal being sold by Cardigan deposits the purchase funds into an escrow account. Upon signature by all required parties, the bank distributes the sale price to the entity who sold Cardigan the coal, with the remaining escrow paid to Cardigan.

approximately 65-70% of Cardigan's coal brokerage transactions were escrow sales. Almost all of the remaining 30-35% of Cardigan's coal transactions (approximately 95%) were "factored."[6] The small percentage of those remaining coal transactions not factored were direct sales to small coal retailers. It is not clear from the record whether Cardigan's resale of coal supplied by Plaintiffs was done via factoring or buyer payment directly to Cardigan, or both. However, it is undisputed that the sales to Cardigan by Southern Appalachian and Cook & Sons were not escrowed or accompanied by any other form of payment guarantee to Plaintiffs other than whatever unsecured credit terms were stated on any invoice or order form. In other words, it was up to Cardigan to see that Plaintiffs' invoices to it were paid. Daniels testified that he proposed an escrow account or letter of credit to Welsh, and even suggested that Southern Appalachian get paid directly from Cardigan's buyer, but Welsh refused to agree to such arrangements.

Initially, the Southern Appalachian/Cardigan coal sales transactions went well, with Cardigan paying within thirty days. The typical end-of-month balance between the two companies during this time ranged from $5,000 to $20,000 for sales in progress. But beginning at the end of August, 2001, the balance due from Cardigan to Southern Appalachian started increasing. Cardigan's office manager Sharon McNiese passed away. Daniels started hearing talk that Cardigan was struggling financially.

Although Southern Appalachian's unsecured accounts receivable balance from

---

[6] "Factoring" occurred when Cardigan bought coal on credit terms via an order acknowledgment, then negotiated a new, hopefully higher, price for that coal with a buyer, reflected in a purchase order. Cardigan turned the purchase order over to First Capital located in Oklahoma City, a factoring company, who then advanced Cardigan 75-80% of the purchase order. The coal buyer paid the purchase price to the factoring company, and First Capital then subtracted the advance to Cardigan and its factoring fee, paying any remainder to Cardigan.

Cardigan was climbing, Daniels opted to continue doing business with Cardigan because Welsh's past history of making payments. In this regard, Daniels testified that "I had done business with Chuck [Welsh] over the years before and never had any problem. He would always pay like net 30 days, no problem. This all happened at once. He got upside down and just couldn't pay." According to Southern Appalachian's bookkeeping ledger, Cardigan had remained current on its payments to Southern Appalachian until August 30, 2001, when its receivable due from Cardigan rose from approximately $20,000 to over $125,000. In addition, at that point Cardigan started making only partial payments for coal shipments, thus resulting in its outstanding balance with Southern Appalachian continuing to grow.

Despite the growing balance, coal sales between Southern Appalachian and Cardigan continued. Three loads of coal were sold to Cardigan by mid-September of 2001 that totaled over $184,000 and, with those shipments, Cardigan's ledger balance exceeded $245,000. Four more loads were shipped and invoiced for the last half of September. Although Cardigan made partial payments during the month toward the invoiced amounts for the coal loads, its end-of-month balance was over $376,000. Daniels told Welsh to pay faster on the account balance. But further shipments and partial payments continued into October and November, 2001. Daniels testified that "as we were shipping, you know, he was paying off what was lagging behind. As we continued shipping, he was trying to get paid off what was lagging behind. So we kept shipping so he would continue paying." The balance at the end of October was over $422,000 and, with the shipments of several more loads of coal to Cardigan generating invoices over $400,000, Cardigan's account due with Southern Appalachian exceeded $800,000 by November's end. The bookkeeping ledger

-4-

reflects some 25 partial payments made by Cardigan in November of 2001 toward its account balance with Southern Appalachian. Cardigan also sent Southern Appalachian a $20,000 check that month, but with instructions to hold the check until January, 2002. The continued sales and only partial payments occurred throughout December, with the ledger balance by year end being almost $1,150,000.

According to Southern Appalachian's account ledger documents, on January 10, 2002, it deposited eight partial payment checks received from Cardigan, including the $20,000 check noted above. Three of those checks were returned to it on January 18, 2002, for insufficient funds (NSF). This was the first instance that Cardigan's payment checks had been returned to Southern Appalachian. Cardigan subsequently covered these checks by wire transfer on January 22, 2002.

Southern Appalachian continued shipping coal to Cardigan, including a substantial shipment in March of 2002 generating an invoice over $168,000, while Cardigan's struggles to pay down its balance continued. Other checks were returned to Southern Appalachian in March, April, June, and August of 2002. Daniels confirmed that these NSF checks payable to Southern Appalachian were all subsequently covered by Cardigan via wire transfer. However, three Cardigan checks dated September 5, 2002, were later deposited by Southern Appalachian in late February, 2003. These checks were subsequently returned on March 6, 2003, per issuance of a stop payment order. Daniels testified these three checks remain unpaid. The summary prepared by Plaintiff's bookkeeper reflects that Cardigan checks totaling $473,058.21 were returned unpaid. Of this total, each check returned for insufficient funds was paid by Cardigan shortly thereafter via wire transfer. The $48,000.00 of that total that was not paid is represented by the three

-5-

checks for which stop payments were issued.

During this time, Southern Appalachian continued to sell coal to Cardigan. Plaintiff's ledger reflects invoices for coal sales made in January, February, March, April, June, and August of 2002. Thus, Southern Appalachian continued to do business with Cardigan despite receiving the first NSF checks in January, 2002.[7] Daniels testified he continued selling coal to Welsh "because he was slowly working down. Because at one time it [Cardigan's account receivable] was in excess of up there, I guess, $1,000,000, and it worked down to like in excess of 400,000. So I had a choice, I could have quit and lost a lot of money or kept working with him at his terms and get part of it."

As noted, Cardigan's ledger balance with Southern Appalachian at the end of 2001 was almost $1,150,000. Cardigan continued making payments during 2002. By the end of May its balance had been lowered to just over $621,100, with a 2002 year end balance of just over $454,100. Southern Appalachian's last sale of coal to Cardigan was in August of 2002, when Daniels said he grew weary of dealing with Welsh and his efforts to catch up on payments, along with concerns to avoid having the account balance climb back up to where it had been. After that last shipment in 2002, Cardigan continued with some payments in 2002, 2003, and 2004. According to Plaintiff's ledger, with those payments, along with a sum received in October, 2004, via garnishment, Cardigan's outstanding

---

[7]The record reflects that Cardigan wrote a number of checks to Southern Appalachian in March of 2002 as partial payments for coal loads Southern Appalachian sold to it in February and March, 2002. These checks total $284,534.81. They were never presented to Citizens Bank for payment.

balance as of that time was $335,712.48.[8]

As earlier noted, Michael Cook met Welsh in 2002; Cardigan and Cook & Sons started doing business shortly thereafter.  It, too, did business with Cardigan without escrow, on an unsecured credit basis.  Cook requested Welsh consider other payment arrangement terms, to ensure payment for his company, but acknowledged that no such guarantee arrangements were ever worked out or put into place.

Cook & Sons' first shipment for Cardigan totaling just over $115,800 occurred in May of 2002, followed by two additional coal shipments.  So, at the time Cardigan made its first payment to Cook & Sons on July 3, 2002, over $200,000 for three coal shipments was due and owing.  Cardigan was by this time already struggling financially, and using current coal sales to pay past due account debt.  Cardigan made only $20,000 partial payments to Cook & Sons for a few months, and these were some of the highest partial payments made.  In addition, some of Cardigan's payment checks to Cook & Sons, similar to checks Cardigan sent to Southern Appalachian, included a written note request by Welsh to hold the checks until instructed to deposit.  But unlike Southern Appalachian, Cook & Sons did not hold the checks but instead presented them immediately for payment, at which point they were returned marked NSF.  At the time the first NSF checks were returned to Cook in September of 2002, Cardigan already had a balance due exceeding $308,000. Despite this, Cook & Sons provided additional coal shipments and sent invoices

---

[8]Although the record lacks specifics, apparently $48,000.00 of this $335,712.48 balance represents Welsh's reimbursement to Southern Appalachian for his contribution toward settlement of a lawsuit.  Welsh attempted to pay this sum by way of the three checks dated September 5, 2002, that were referred to earlier, deposited by Southern Appalachian in February of 2003 and returned because of stop payment orders.

in November of 2002.  Cardigan continued making partial payments only.

Mike Cook testified that, after sending Cardigan the initial shipments totaling over $200,000 with no payment yet received, he felt boxed in with Welsh at that point, and was trying to figure out how he was going to get the $200,000 and recognizing that if they cut Welsh off, they risked losing the $200,000.  He therefore opted to continue doing business with Cardigan, with the hope that Welsh would somehow dig himself out of the $200,000 hole and pay for the new coal they continued to sell to him.  Nevertheless, as shipments continued, it took longer and longer to receive payment toward them, since the early partial payments were applied to the initial shipments.

By the end of 2002, Cardigan had an outstanding balance to Cook and Sons just shy of $284,300.  Cardigan sent two partial payments in early January, 2003, around the same time that a final coal shipment of over $140,000 was sent and invoiced by Cook and Sons.  Although Welsh had flagged the partial payment checks with a notation to hold until instructed to deposit, Cook and Sons proceeded to deposit them.  They were returned for insufficient funds and so Cardigan's balance remained at $284,300.  With that final coal shipment, the outstanding balance increased in January of 2003 to $336,616.09.  Cook acknowledged that the situation with Cardigan went from bad to worse, in that each time that sold him more coal with the hope of getting caught up, Cardigan would just get deeper in the hole with them.  Cardigan continued making partial payments on the balance through mid-2003, eventually paying down the account balance until $249,298.64 was still due and owing.

Cardigan did at least some of its banking with Defendant Citizens Bank of Northern Kentucky (Citizens Bank or Bank).  During this time, Defendant Teresa Gillum was the

-8-

assistant branch manager of Citizens Bank. Welsh had various personal and several business accounts at Citizens Bank. The corporate accounts included an interest-bearing money market account and a checking account. Monies received from Cardigan's resale of the coal it purchased from Plaintiffs was deposited into the money market account.[9] The checking account served as Cardigan's operations account. As checks written from Cardigan's checking account were presented for payment, Welsh authorized the transfer from the money market account to the checking account to pay those checks.

When Cardigan started struggling financially, the money market account lacked adequate funds to cover all of the Cardigan-issued checks presented to Citizens Bank for payment. Welsh requested Citizens Bank provide him with a daily bank statement, and a list of the checks presented against the checking account on the previous day. Welsh and the Bank, primarily Gillum, would communicate to discuss the daily insufficient funds report. Welsh would give Gillum instructions on how much money to transfer from the corporate money market account into the checking account, and instruct which checks to pay, which to return marked NSF, and which to return designated as payment stopped by Cardigan.

An additional, unusual feature to Cardigan's banking status with Citizens Bank was that Gillum served not only as the primary contact between Welsh/Cardigan and the Bank in dealing with their accounts; Gillum also had an outside working relationship with Cardigan. She was hired by Welsh as an independent contractor and paid to do clerical

---

[9] Welsh testified that funds received from First Capital's "factoring" were deposited into Cardigan's checking account. However, from other record information, it appears these funds were actually deposited into the money market account.

work for Cardigan. She did this for about a year, during the time Cardigan had its accounts at Citizens Bank. She was paid approximately $8,000 for this work, which consisted of compiling a ledger of factoring transactions from First Capital based upon information reported on other business records. This report was prepared for the use of Cardigan's accountant. Although Gillum testified that she received permission from the branch manager to engage in this outside work for a Bank customer, the record suggests there was also some form of disciplinary proceeding pursued against her based upon a conflict of interest.

After Cardigan's financial troubles began and then snowballed, there were a substantial number of checks being written and presented for payment for which coverage or return decisions had to be provided. Eventually Cardigan's accounts at Citizens Bank were closed in 2003 due to inactivity. Cardigan opened new business accounts with National City Bank, which it utilized until Cardigan went out of business in 2004.

In 2004, when Cardigan's negative account balance remained despite the multiple partial payments, Southern Appalachian sued Cardigan in Campbell Circuit Court. In early August 2004, the companies entered into an agreed judgment in favor of Southern Appalachian in the sum of $563,422.45. However, that judgment was essentially uncollectible from Cardigan.

On October 19, 2005, Southern Appalachian filed suit in this Court against not only Cardigan, but also Welsh, Citizens Bank, and its assistant manager, Teresa Gillum. Southern Appalachian's Complaint alleges $563,422.45 is due on Cardigan's account (the sum reflected in the state-court agreed judgment), although the bookkeeping records submitted in this case reflect an outstanding balance owed of $335,712.48. The focus of

-10-

this suit is to collect the balance from others whom Southern Appalachian asserts are also responsible to it for Cardigan's dealings under state and federal law. Cook & Sons jumped onto the collection bandwagon, by way of Intervening Complaint adopting the theories and claims advanced by Southern Appalachian. The Intervening Complaint asserts damages of $291,596.04, although Plaintiff's records referred to in the course of discovery evidence a balance owed to it by Cardigan of $249,278.59.

The legal theories advanced by Plaintiffs are grounded mostly on concepts of fraud and negligence. They claim that Citizens Bank and Gillum negligently failed to regulate Cardigan's conduct (Count VI); that Citizens Bank is liable for any negligence of Gillum based upon respondeat superior (Count VII); that Citizens Bank and Gillum breached a fiduciary duty to Plaintiffs (Count V); that Citizens Bank and Gillum aided and abetted Cardigan to misrepresent its financial condition to Plaintiffs (Count VIII); that Citizens Bank and Gillum aided and abetted (acted in concert) with Welsh and Cardigan to commit fraud and misrepresentation (Count I); that Welsh is individually and personally liable and responsible for the actions of Cardigan, as its separate corporate existence was not sustained (Count IX); that Citizens Bank, Gillum, and Welsh engaged in a state-law civil conspiracy (Count XIV); that Citizens Bank, Gillum, and Welsh violated RICO, 18 U.S.C. §§ 1962 and 1964, by engaging in a pattern of racketeering activity (Counts XII and XIII);[10] and that Defendants' conduct gives rise to liability for punitive damages (Count XV).

---

[10]Plaintiffs' Complaints also initially included claims of federal mail, wire, and bank fraud (Counts II, III, and IV). Conceding that no private right of action for violation of these federal criminal statutes exists, Plaintiffs have voluntarily withdrawn these claims. With respect to Plaintiffs' RICO claims, they initially sued Defendants for violations of all four subsections of the RICO statute, 18 U.S.C. § 1962. However, in their briefing they voluntarily dismiss their argument of liability under and claims based upon subsections (a) and (b) of the statute (Counts X and XI).

## II. DISCUSSION

### A.    *Standard of Review*

The proper standard for entry of summary judgment is well known.  Federal Rule of Civil Procedure 56(c) provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

*Id.*  A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001).

The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  To meet this burden, the moving party may rely upon any of the evidentiary sources listed in Rule 56(c) or may rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir. 1989).  Essentially, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up" on a critical issue. *Id.*

Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must instead demonstrate that there is a genuine issue for trial. *See Celotex,* 477 U.S. at 324.  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts, it must present

-12-

significant probative evidence in support of its complaint to defeat the motion for summary judgment." *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 341 (6th Cir. 2006); *Anderson*, 477 U.S. at 248-49. The nonmoving party must produce affirmative evidence of the existence of a material fact. *See id.* at 251-52. "The mere presence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

Summary judgment is properly granted if the party who would bear the ultimate burden of proof at trial fails to establish an essential element of the claim. *See Tolton v. American Biodyne, Inc.,* 48 F.3d 937, 941 (6th Cir. 1995). If a reasonable jury could not return a verdict for the nonmoving party based on the evidence construed in its favor, summary judgment should be granted to movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). With this standard in mind, the Court turns to the parties' motion presentations.

### B.    RICO

Plaintiffs allege that Defendants violated the federal civil RICO statute, 18 U.S.C. § 1962, entitling them to civil remedies under § 1964, by engaging in a pattern of racketeering activity (Counts XII and XIII). The RICO subsections Plaintiffs rely upon provide:

> (c)    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

> (d)    It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. §§ 1962(c) & (d).

To sue under RICO, a plaintiff must establish that a "person" (i.e., defendant) through an "enterprise," engaged in a "pattern" of "racketeering activity." Standing to assert a violation also requires that the conduct constituting the violation injured plaintiff in his business or property; i.e., caused "damages." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985).

### (1)   RICO Enterprise

RICO defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  Here, Plaintiffs allege that Defendants – Welsh, Cardigan (and Carcoal), Gillum, and Citizens Bank – formed an "enterprise." Southern Appalachian and Cook & Sons sweep the Defendants together.[11] They maintain that Defendants constituted an "association-in-fact" under § 1961(4).

In *United States v. Turkette,* 452 U.S. 576 (1981), the Supreme Court defined a RICO enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 583.  The enterprise, therefore, consists of some organization beyond just the persons themselves.  It is proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*

*Turkette's* informal "association-in-fact" still requires "a certain amount of

---

[11] Plaintiffs do not assert that Cardigans itself is the "enterprise," since case law dictates that "a corporation cannot be both the 'enterprise' and the 'person' conducting or participating in the affairs of that enterprise." *Begala v. PNC Bank,* 214 F.3d 776, 781 (6th Cir. 2000).

organizational structure" in order to establish a RICO enterprise. *VanDenBroeck v. Commonpoint Mortgage Co.,* 210 F.3d 696, 699 (6th Cir. 2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.,* 128 S. Ct. 2131 (2008). "Most cases interpreting the elements applicable to this statute require evidence of some sort of 'chain of command' or other evidence of a hierarchy." *Id.* at 700. "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the activity in which it engages." *Turkette,* 452 U.S. at 583; *VanDenBroeck,* 210 F.3d at 699. Showing an enterprise that exists separate from the activity in which it engages requires a showing of some minimal level of organizational structure, *id.*; otherwise, the enterprise is nothing more than just the fact that the alleged acts were committed by the named defendants.

Plaintiffs maintain that an association-in-fact enterprise comprised of Defendants has been shown because Defendants engaged in a course of conduct for the "common purpose" of making money. It is difficult to view such common purpose as having any evidentiary strength, given the weak evidence Plaintiffs present. They point to the monies received by Gillum for her part-time moonlighting for Cardigan. They rely upon the minimal sum Citizens Bank would have received on Cardigan's many returned checks and stop payment orders, which Southern Appalachian characterizes as the Bank's "handsome reward." Even more difficult to accept as sufficient is that Welsh or Cardigan "made money." Perhaps Plaintiffs could advance this position by the fact that Welsh and Cardigan may have sought to achieve an economic gain, as any evidence from Plaintiffs that they actually did so is clearly lacking.

As for the structure of the enterprise, Plaintiffs present an interesting "chain of

-15-

command" scenario. They submit that Welsh was the "centralized leader," giving commands to Gillum and Citizens Bank by his daily instructions concerning Cardigan's checking account.[12] Southern Appalachian argues Welsh's authority is evidenced by the fact that on a daily basis he overrode the Bank's policy of paying the lowest dollar check first, then continued in that fashion until arriving at the check that overdraws the account. However, this "authority" is nothing more than what Citizens Bank permitted all of its customers to do. According to testimony from the Bank manager, the same testimony upon which Plaintiffs rely, this order of payment for NSF checks was indeed the Bank's policy, but provided there were no other instructions given by the account holder.

In the Court's view, Plaintiffs fail to actually *evidence,* rather than merely assert, that Defendants should be deemed an association-in-fact enterprise, with respect to the facts alleged. Plaintiffs have not articulated or connected exactly how the Defendants operated as an enterprise under the different facts. Instead, at this post-discovery stage, Plaintiffs have done little more than describe different facts, then conclude Defendants acted as an enterprise. There is no showing of a coherent, minimal level of "organizational structure" as required by *VanDenBroeck*, 210 F.3d at 699, and how it is distinct from the persons involved. Citizens Bank was Cardigans' banking institution, and Gillum was the Bank employee overseeing Cardigans' accounts. Cardigan engaged in the business of coal purchase and resale, via actions of its owner and operator Welsh. They do not explain

---

[12] Plaintiffs also point to an occurrence involving the escrow account for the benefit of U.S. Steel and TECO, claiming there was some override of the requirement to deposit the funds in that escrow and suggest that override was facilitated by Gillum. However, the details provided by Plaintiff are vague at best and, as Defendants note, this escrow account is not a part of this lawsuit and was not part of the coal transactions between Plaintiffs and Cardigan.

-16-

why these "persons" should be viewed as a concerted "enterprise" beyond the fact that all were connected and had contact with each other via a banking relationship.

### (2)    Racketeering Activity - a Scheme to Defraud

Presuming sufficient evidence of an enterprise had been shown to survive summary judgment, the "racketeering activity" necessary to sustain a RICO claim may be any of the predicate offenses detailed under § 1961(c). At this post-discovery stage, Plaintiffs represent they rely upon mail fraud, § 1341, and wire fraud, § 1343. Mail fraud (and similarly wire fraud) occurs when one "having devised or intending to devise any scheme or artifice to defraud," uses the mail (or wires) "for the purpose of executing such scheme or artifice or attempting to do so." Moreover, a "pattern" requires at least two or more acts of the alleged racketeering activity within ten years. 18 U.S.C. § 1961(4).

Plaintiffs maintain that Defendants used the mails or wire for purposes of executing a scheme to defraud. *United States v. Cantrell,* 278 F.3d 543, 546 (6th Cir. 2001) ("scheme to defraud" contemplated use of the mails or electronic communication). A scheme to defraud requires "misrepresentations or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension." *Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322 (6th Cir. 1999).

At the time the dispositive motions in the instant matter were filed, the parties included arguments directed to whether Plaintiffs had established a showing of reliance upon the misrepresentation or omission, as discussed by the Sixth Circuit in *Auto Club. Id.; see also VanDenBroeck,* 210 F.3d at 701 (RICO plaintiff relying upon mail fraud must show it in fact relied upon defendant's misrepresentations). However, since the briefing

-17-

in this case, the Supreme Court in *Bridge v. Phoenix Bond & Indemnity Co.,* 128 S. Ct. 2131 (2008), has clarified that first-party reliance is not an element of a civil RICO claim predicated on mail fraud. *Id.* at 2139. In resolving a split in the circuits, the Court reasoned that the statute recognizes that "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id.* Reliance is simply not a requirement of the statutory crime of mail fraud. *Id.* at 2138 (quoting *Neder v. United States,* 527 U.S. 1, 24-25 (1999) ("The common-law requiremen[t] of 'justifiable reliance' ... plainly ha[s] no place in the [mail, wire, or bank] fraud statutes")).[13]

Plaintiffs' presentation of a "scheme to defraud" is primarily conclusory statements that appear to be based on inferences they believe to be reasonable based upon certain evidence. For example, Southern Appalachian's offer of proof as to the "intentionally fraudulent scheme" and evidence supporting it can be summarized as follows:

> It was important for Welsh to maintain an image that he was solid as a rock in order to continue doing business. It was critical that he maintain the trust and confidence of the parties with whom he transacted business, to create the appearance that all obligations would be honored.

> The Bank and Gillum gave Welsh and his companies that illusory mantle. Gillum had actual knowledge of the kinds of transactions that were being processed by Citizens Bank on behalf of Welsh and his companies, in particular with regard to transactions that went through the escrow accounts.

---

[13] In their cause of action before this Court, Plaintiffs included state-law fraud claims. In addition, in responding to Defendants' dispositive filings, Plaintiffs presented a combined analysis of their RICO and state-law fraud claims, offering that the requirements of a fraud claim in Kentucky go hand-in-hand with proof of a scheme to defraud required under RICO. Given *Bridge,* this is no longer the case, at least with respect to RICO actions premised upon mail (and wire) fraud. As discussed herein, Plaintiffs' RICO claims fail to survive summary judgment for lack of sufficient proof on several fronts, without regard to reliance. But given Plaintiffs' combined presentation of the claims, for ease of analysis given that the same facts are relied upon by Plaintiffs to sustain both their RICO and common law fraud claims, discussion of the fraud claim is included in this section. And as discussed in this section, evidence of reliance for that common-law claim is also lacking.

Gillum was aware of Mr. Welsh's accounts and the activities of the accounts on a daily basis. Indeed, Gillum's alleged report supposedly concerned factoring money from First Capital. Even the Branch Manager was aware there was "another half to this [checking] account, [namely] the money market account.

Citizens Bank improperly allowed Welsh to keep the money market account flush with cash. Citizens Bank did this through abuse of the escrow account....

Welsh, in turn, worked the con on the coal supplier.... He said, I've got to have it [the coal] or you won't get paid."

. . . .

Welsh used checks to induce coal suppliers – and Southern Appalachian – to part with their coal. Welsh couldn't do that without the Bank's complicity, their willingness to look the other way regarding the way Welsh used the accounts. The Bank knew it was wrong, that these companies were being bilked.

(Doc. #114, pp. 21-23)(deposition references omitted). While this may be Plaintiffs' theme for their RICO case, it simply does not evidence an "intentional scheme to defraud."

According to Plaintiffs, Defendants presented a picture that Cardigan was a sound, viable entity or, for purposes of Plaintiffs' state-law claim, that Plaintiffs relied on this.[14] The only direct representation Plaintiffs point to is that at some point in Southern Appalachian's business dealings with Cardigan, Daniels contacted Citizens Bank and was told by someone, perhaps Teresa Gillum, that Cardigan was a $20 million company. But Plaintiffs fail to show the specifics of this representation or that it was in fact false at the time it was

---

[14] As previously noted, this direct reliance is not required for Plaintiffs to sustain a civil RICO claims. However, reliance is required for Plaintiffs' state common law fraud claims against Defendants. In Kentucky, fraud requires evidence of (1) a material misrepresentation; (2) which is false; (3) which was known to be false or made recklessly; (4) made with inducement to be acted upon; (5) acted upon in reliance thereon; and, (6) causing injury. *United Parcel Serv. v. Rickert,* 996 S.W.2d 464, 468 (Ky. 1999).

-19-

made.  Moreover, they have not established that Southern Appalachian actually relied upon this information in deciding whether to do business with Cardigan, particularly since Daniels had prior knowledge and business dealings with Welsh.

Based upon the course of discovery, Plaintiffs argue that the manner in which Cardigan's money market and checking accounts were handled violated Federal Reserve Regulations D and Q.  Federal Reserve Regulation D limits transfers from a money market account to six per month.  Federal Reserve Regulation Q prohibits paying interest on a money market account if Regulation D is violated.  As explained by Plaintiff's banking expert, these regulations are in place so that banks will satisfy their obligations to maintain reserves.  The purpose of the regulations is not to protect bank customers or check payees.  Thus, violations of Regulation D and Q do not, by themselves, give Southern Appalachian or Cook and Sons a private cause of action against Citizens Bank.  To the extent Plaintiffs would rely upon violations of Regulations D and Q as some of the evidence they look to as supportive of their claims of fraud and misrepresentation, it does not. Neither Welsh nor Gillum and Citizens Bank made express representations to Plaintiffs about compliance with these Federal Reserve Regulations, and neither did their silence on the point have any connection with the Cardigan-Plaintiffs business transactions involved herein.  Plaintiffs were not even aware of the nature of any Federal Reserve Regulations and how they applied to Cardigan's account, nor could some generic reliance upon Cardigan's compliance with banking regulations generally and Regulations D and Q specifically have caused Plaintiffs to sustain injury.

Instead, Plaintiffs rely upon the money market deposit/checking transfer arrangement used by Welsh as evidence supporting a jury's conclusion that the checks

-20-

written by Welsh were fraudulent. In other words, because at the time Welsh wrote checks the funds to cover them were not present in Cardigan's checking account, then present intent to pay was absent, giving rise to theft by deception under Kentucky law. Plaintiffs additionally look to the notion that Gillum and Citizens Bank allowed Cardigan's accounts to be set up and operated in this fashion, were therefore aware that checks written were illusory because no funds were then present in the account when written, and so participated in the fraudulent misrepresentations.

Even viewing this information and evidence in the light most favorable to Plaintiffs, it does not advance their cause in defeating summary judgment. This is because the Court is called upon to give Plaintiffs the benefit of *reasonable* inferences from the evidence, not illogical ones. If the accounting arrangement as described above were evidence of fraud by Defendants, then fraud would have occurred at the moment Plaintiffs engaged in that first sales transaction, because Cardigan's accounts had already been set up in this fashion. Yet it is undisputed that Plaintiffs were not aware of this account set up nor was there any obligation to disclose it to them.[15] They voluntarily chose to do business with and made initial coal shipments to Cardigan. Moreover, this same account setup resulted in

_____

[15] Plaintiffs also argued that Gillum and Citizens Bank should have prepared Suspicious Activity Reports (SAR) on Cardigan's accounts. The existence and content of an SAR relating to bank accounts is statutorily privileged and confidential, as Plaintiff's expert concedes. Rugh testified that disclosure even in court proceedings is prohibited by law. As this information is not publicly available nor otherwise issued for the benefit of, seen by, or even known about by third parties such as Plaintiffs, whether the Bank should have prepared one or did provides no private cause of action. Plaintiffs' expert agreed that he knew of no harm to Plaintiffs if the Bank should have but did not file an SAR.

Moreover, Plaintiffs filed a motion to compel in this case, seeking production of any such SARs, which motion was denied by the Magistrate Judge. Plaintiffs challenged that discovery ruling. But as these materials are privileged and no legal basis to reject the Magistrate Judge's reasoning was shown by Plaintiffs, their objections to that order are also herein overruled.

-21-

many checks issued to Plaintiffs being paid, contrary to the sought-after inference that Welsh had no intention of paying the checks when he wrote them. Indeed, as to Southern Appalachian, Cardigan had written it checks for some time without incident, yet under Plaintiffs' view of the undisputed facts and conclusions that should be reasonably drawn therefrom, all of these "good" or honored checks would also be fraudulent.

Moreover, Plaintiffs fail to establish the presence of a jury issue on the question of fraud even as to the NSF checks they did receive. As discussed, the need to transfer monies to the checking account at presentment does not mean Cardigan did not intend to honor the check when it was written. And the fact that the check was returned for insufficient funds also does not evidence that Cardigan did not intend to honor the check when it was written; the only reasonable inference based upon the evidence is the check's return as unpaid reflected the downturn in Cardigan's business and that there were no longer adequate incoming deposits to cover all of the checks written, depending upon their presentment.

Neither was this situation hidden from Plaintiffs, as both Daniels and Cook testified they became aware Welsh's business was struggling. Welsh's notes on the checks requesting they be held until instructed also evidences a lack of intent by Cardigan to defraud. In other words, the later checks written by Welsh and accompanied by a note were not issued to give Plaintiffs a false impression or represent the monies were available and to induce Plaintiffs to act accordingly – that is, immediately presenting the check and continuing to do business with Cardigan under the erroneousness impression that its financial situation was sound. Rather, the only reasonable inference from the hold notes was that the business was generally suffering financially or having immediate cash flow

-22-

problems specifically.

Finally, as pointed out by Citizens Bank, these NSF checks cannot be looked to in support of a claim of fraud under Kentucky law because the undisputed evidence is that the checks were not written simultaneously with Cardigan's receipt of property, that is the coal shipments. *See C.G. Stiles v. Commonwealth,* 348 S.W.2d 843 (Ky. Ct. App. 1961). Plaintiffs encourage the Court not to apply such a hypertechnical and outmoded legal analysis, but fail to identify any other more recent legal authority that this Court is obliged to apply that is contrary to Defendants' position.

### (3)    Causation/Damage

In addition, while first-party reliance is not required for a RICO claim based upon mail/wire fraud, causation is required. *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461 (2006). Defendants argue Plaintiffs have failed to evidence that their injuries were "directly caused" by Defendants' conduct that allegedly violated RICO. Plaintiffs cannot show merely that their injury would not have occurred "but for" Defendants' conduct; they must instead prove proximate causation. *Pik-Coal Co. v. Big Rivers Elec. Corp.,* 200 F.3d 884, 889 (6th Cir. 2000).

Plaintiffs alleged connection of Defendants' so-called representations of Cardigan's soundness, allowing transfers of money market funds to cover checks during Cardigan's solvency, and Welsh dictating the order of payment of NSF checks when Cardigan lacked adequate funds, are too tenuous to establish legally sufficient proximate causation. Although Plaintiffs maintain that a direct causal link of misrepresentations flowing from Defendants to Plaintiffs has been established, even were the Court to view these as

-23-

sufficient, they rely upon these same actions as providing the needed evidence of causal link to their *injuries*. However, they do not and cannot show they were actually entitled to payment of monies otherwise available and otherwise converted or diverted by Defendants. Their repeated conclusory statements that they were harmed because they relied on Defendants' fraudulent schemes is simply insufficient at this stage of the proceedings to satisfy their burden of coming forward with evidence that would reasonably support such a conclusion.

Indeed, this leads to a point vehemently contested by Defendant Gillum – damages. She argues at length that the undisputed evidence shows Plaintiffs' outstanding balances due from Cardigan actually decreased over time from their peak. Yet, had Citizens Bank and Gillum demanded or forced account closure for violation of Regulations D and/or Q as Plaintiffs contend, or because it should have become obvious to the Bank that Cardigan's transactional behavior was nefarious or, at a minimum that it was struggling financially, Plaintiffs' losses actually would have been more than the account balances established during discovery. The undisputed evidence is that Cardigan outstanding balance with each of the Plaintiffs is less than it was at the time the first check was returned to each of them for insufficient funds. No fraud can be established from that point forward because no injury has or can be shown.

### (4) Subsections (c) and (d)

Proof of a scheme to defraud lacking, further consideration of Plaintiffs' RICO contentions are unnecessary. However, for purposes of completeness and because Plaintiffs also rely on a conspiracy under RICO as also demonstrating its state-law collaborative claims, brief discussion is warranted.

-24-

Subsection 1962(c) makes it unlawful for "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Plaintiffs contend that the participation of Welsh and Gillum in the enterprise, and through them the participation of Cardigan/Carcoal and Citizens Bank, is beyond dispute. Defendants, of course, contend otherwise. Gillum's participation, maintain Plaintiffs, is demonstrated by her side employment with Cardigan. According to Plaintiffs, the facts show that this employment was improper under the Bank's conflict of interest rules, the report or ledger she prepared was not actually used by Cardigan but rather a pretext to pay her money, and those payments were shrouded in secrecy. Defendants, of course, have a different view of this information, arguing that the Bank was aware of her work for Cardigan, and offering affidavit testimony from Cardigan's former accountant to verify the nature and scope of Gillum's ledger preparation work, done for and used by him. Yet, even accepting that issues of fact surrounding Gillum's employment by Cardigan exist as to participation specifically, the sufficiency of asserting a § 1962(c) violation is closely dependent on the enterprise element, an element Plaintiffs have not satisfied as discussed above.

In addition, Plaintiffs do not detail the Bank's "participation" in the enterprise. Presumably they rely upon respondeat superior liability under RICO upon a corporate "person" for its agent's acts, *see Davis v. Mutual Life Ins. Co.,* 6 F.3d 367, 379 (6th Cir. 1993), provided the corporation is clearly distinct from the enterprise. If Plaintiffs rely upon Gillum's outside employment by Cardigan as her "participation" in the enterprise from which she achieved the common purpose of making money, this raises the question of whether a corporate agent's *outside* employment can serve to impose vicarious liability

-25-

upon the corporation. Plaintiffs do not address this point by elaborating on what facts they rely upon to show either the Bank's direct participation in the money-making scheme, or their vicarious participation.

The remaining subsection upon which Plaintiffs rely, § 1962(d), makes it unlawful for "any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." The Sixth Circuit requires the plaintiff "to establish, in addition to the aforementioned elements, the existence of an illicit agreement to violate the substantive RICO provision." *United States v. Sinito,* 723 F.2d 1250, 1260 (6th Cir. 1983).

Plaintiffs offer virtually no specific evidence to support their reliance upon RICO's conspiracy section. They simply argue that the "scores of racketeering acts" in this case could not have been committed by Defendants without there also being an agreement. Southern Appalachian submits that the existence of the illicit agreement "is evident from their concerted action on a daily basis." In other words, Plaintiffs provide no evidence of *any* agreement under § 1962(d), other than bare allegations that Defendants conspired to violate one or more of the provisions of RICO.

In summary, Plaintiffs fail to come forth with evidence as to what material misrepresentations were made by Defendants, that Defendants made them recklessly or knew them to be false, that Defendants expected Plaintiffs to act in reliance upon them and did, for purposes of state-law fraud, and that Plaintiffs were thereby injured. Sufficient proof of virtually every element for civil RICO as well as state-law fraud are lacking, even viewing what little evidence has been presented in a light most favorable to Plaintiffs. Thus, the Court concludes that the lack of fact issues as to actionable fraud by any of the Defendants (Count I) or actionable civil liability under RICO (Counts XII and XIII) dictates

-26-

summary judgment in Defendants' favor on these claims.

### C. *Plaintiffs' Collaborative Theories*

Plaintiffs also maintain that the Defendants conspired to engage in fraudulent conduct (Count XIV). To further such a claim past summary judgment, Kentucky law requires evidence of a corrupt or unlawful combination or agreement between two or more people to do by concert of action an unlawful act. *See Montgomery v. Milam,* 910 S.W.2d 237, 239 (Ky. 1995). Joint assent of the minds of those to the unlawful enterprise must be shown, although it may be inferred. *James v. Wilson,* 95 S.W.3d 875, 912-13 (Ky. Ct. App. 2002). However, mere negligence is not sufficient to support a claim for civil conspiracy in Kentucky; defendants must act pursuant to a common design, or render substantial assistance to others to accomplish the unlawful act.

Plaintiffs in the case at bar explain the black letter standard for such a claim in Kentucky, but offer no application of this standard, aside from submitting that the same facts supporting their RICO conspiracy claim support this state-law claim against Defendants. Therefore, for the same reasons the Court concluded Plaintiffs have failed to establish their RICO conspiracy claim, their state-law conspiracy claim also fails. Any misconduct engaged in by Welsh in his account payment practices with Plaintiffs may have gone unchecked for a period of time because, argue Plaintiffs, Citizens Bank and Gillum refused to require closure of Cardigan's accounts. But even when this evidence is viewed in the light most favorable to Plaintiffs, it does not show or provide an inference that the Bank and Gillum intended to give substantial assistance to Welsh's misconduct.

Plaintiffs further advance that Citizens Bank and Gillum are liable as aiders and abettors under state law (Count VIII). They point out that, while Defendants contend there

is no such action in Kentucky, the legal theory of aiding and abetting has in fact been recognized in Kentucky as an "action in concert." There appears to be some overlap with this and the common law civil conspiracy theory Plaintiffs rely upon, as Southern Appalachian again cites to *James v. Wilson*, 95 S.W.2d 875 (Ky. Ct. App. 2002) in support of this additional theory.

Plaintiffs offer that the legal standard recognized in Kentucky for this claim is derived from the Restatement of Torts:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct separately considered, constitutes a breach of duty to the third person.

*Farmer v. City of Newport,* 748 S.W.2d 162, 164 (Ky. Ct. App. 1988) (quoting Restatement (Second) of Torts § 876).

But similar to the manner in which Plaintiffs separately asserted civil conspiracy claim, they once again cite Kentucky authority recognizing this claim, but provide no elaboration as to which subsection of the statute is relied upon or any analysis thereof in conjunction with the facts of this case. Even accepting the black letter standard for this claim to be as Plaintiff offers it, this Court is not required to scour the record to determine the existence of any genuine issues of material fact for trial on this claim. *See Street v. J.C. Bradford,* 886 F.2d 1472, 1479-80 (6th Cir. 1989).

### D.    Legal Duties of Citizens Bank and Gillum

In their Complaint and Intervening Complaint, Plaintiffs assert that Teresa Gillum

-28-

and Citizens Bank breached a fiduciary duty to them (Count V), and that their failure to regulate Cardigan's conduct constitutes negligence (Count VI). Determining whether these Defendants are entitled to summary judgment on these claims necessarily first requires an examination of what legal duties, if any, were imposed upon Gillum and Citizens Bank with respect to their relationship with Plaintiffs.

There is no "automatic" fiduciary duty or fiduciary relationship merely because one of the parties to the relationship is a financial institution. Citizens Bank and Gillum argue that they owed no such fiduciary duty to Plaintiffs by law, and Plaintiffs have not established the parties had any agreement or understanding that Citizens Bank would act in Plaintiffs' fiduciary interest.

Kentucky law, and Sixth Circuit authority interpreting Kentucky law, outline what constitutes a fiduciary relationship. *See In re Sallee,* 286 F.3d 878, 892-93 (6th Cir. 2002). Generally, a bank does not have any fiduciary relationship to third parties, such as Plaintiffs herein. In fact, banks generally do not even have a fiduciary relationship with their own customers, but rather a debtor/creditor relationship that does not impose fiduciary duties on a bank. *Id.* (citing *Steelvest, Inc. v. Scansteel Serv. Cent.,* 807 S.W.2d 476, 485 (Ky. 1991)). In *Sallee,* the court stated:

> Under Kentucky law, a fiduciary relationship is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person *to act primarily for another's benefit* in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 485 (Ky. 1991)(emphasis added).

> In *Steelvest,* the Kentucky Supreme Court described a fiduciary relationship:

> The relation[ship] may exist under a variety of

-29-

circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and *with due regard to the interest of the one reposing confidence*.

. . . .

Fiduciary relationships arise when circumstances and the relationship of the parties show the parties understood and agree that confidence is reposed by one party and trust accepted by the other. Fiduciary relationships can be informal, but they must evidence circumstances showing both parties agreed that one party would be acting in the interest of the other.

*Sallee*, 286 F.3d at 892-93. "A generalized trust in other businessmen and businesswomen cannot create a fiduciary relationship." *Id.* at 895.

To establish that a fiduciary relationship existed, the party claiming the relationship must first show the relationship existed before the transaction that is subject of the action. *Sallee*, 286 F.3d at 892. Second, the party claiming the fiduciary relationship must establish that reliance was not merely subjective. *Id.* Lastly, the party claiming the fiduciary relationship must establish the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary. *Id.*

In the case at bar, Plaintiffs have not presented evidence to establish a prior fiduciary relationship existed with either Citizens Bank or Gillum prior to the Cardigan transactions. Plaintiffs had no banking relationship with Citizens Bank that pre-existed their business dealings with Cardigan. Thus, Plaintiffs cannot establish they had an existing fiduciary relationship with Citizens Bank or Gillum prior to the Cardigan transactions. Neither have Plaintiffs set forth any facts that establish their relationship with the Bank or

Gillum imposed a duty on those Defendants to act in Plaintiffs' best interest, even if the action would be to the detriment of the Bank and Gillum.

Moreover, with no fiduciary duties owed to Plaintiffs, it is difficult to comprehend Plaintiffs' assertion of a simple negligence claim against Cititzens Bank and Gillum. Plaintiffs' maintain that these Defendants negligently failed to regulate Cardigan's conduct. Of course, the universal standard for claims of negligence requires proof of duty, breach, causation, and damages. Advancement of this theory by Plaintiffs requires establishing not just that Citizens Bank and Gillum owed a legal duty to Cardigan to regulate its conduct but also, even presuming this to be true, that these Defendants also owed a legal duty to anyone dealing with its customer Cardigan that its customer's banking conduct was sound. Defendant cite a number of cases involving financial institutions, to support the conclusion that the scope of persons to whom a bank owes a legal duty is limited. In its response, Southern Appalachian works to distinguish these "bank" cases. Yet, more important, Plaintiffs fail to offer Kentucky authority recognizing or supporting the recognition of a legal duty generally or fiduciary duty that would be owed to them by Gillum and the Bank under these circumstances. Cook & Sons points to the case of *Estate of Bras v. First Bank & Trust Co.,* 821 P.2d 387 (Okla. Ct. App. 1991). Aside from the fact that the decision is persuasive only, it considered what legal duties should be recognized as being owed by the bank in relation to a *borrower.* That court's imposition of legal obligations on that relationship is consistent with the trend in Kentucky law of recognizing that there may be circumstances giving rise to a legal duty, but limited to situations involving those with a particular relationship status to a bank, such as depositors or borrowers. But there is no authority recognizing extension of a duty in situations involving third parties such as

-31-

Plaintiffs herein, and neither is the *Estate of Bras* case relied upon persuasive to such a conclusion.

In summary, Plaintiffs claims against Gillum and Citizens Bank for negligence and breach of fiduciary duty, and against Citizens Bank for any negligence of Gillum based upon respondeat superior fail as a matter of law. Plaintiffs have not presented any evidence to establish a fiduciary relationship existed between them and these Defendants or that there was otherwise any legal duty or obligation running to them from these Defendants under Kentucky law. Counts V, VI, and VII of Plaintiffs' Complaint and Intervening Complaint will therefore be dismissed.

### E.    Respondeat Superior

Plaintiffs also contend that Citizens Bank is vicariously liable for damages on their state-law claims based upon Gillum's tortious acts (Count VII). However, while Southern Appalachian  argues that Gillum "lined her own pockets," they fail to present what intentional or negligent tortious acts were committed by her for which she can be held civilly liable to Plaintiffs, and for which tortious acts the Bank would also be liable under respondeat superior liability. The analysis of Plaintiffs' presentation of state-law claims thus far concludes she owed no  general legal or fiduciary duties to Plaintiffs, nor has a jury issue as to common law fraud or civil conspiracy or aiding/abetting by her been shown by Plaintiffs. Thus, the question of whether Citizens Bank is liable under principles of respondeat superior is not implicated, and the Bank is therefore entitled to summary judgment on this claim.

### F.    Piercing the Corporate Veil

-32-

Plaintiffs also sue Welsh individually and personally, arguing that Cardigan's corporate veil should be pierced and Welsh held liable and responsible for the actions of Cardigan and resulting damages (Count IX). Corporations are generally regarded as separate from the individuals comprising it. *Morgan v. O'Neil,* 652 S.W.2d 83 (Ky. 1983). But of course there are exceptions to general rules. The exceptions to this general rule call for the veil of corporate existence to be pierced and the persons making up the corporation held responsible for the entity's financial liabilities when the corporation is used to justify wrong, protect fraud or defend crime, or subvert public policy. *Dare to be Great, Inc. v. Commonwealth,* 511 S.W.2d 224, 227 (Ky. 1974); *Commonwealth v. ABAC Pest Control,* 621 S.W.2d 705, 708 (Ky. Ct. App. 1981). Three theories have been used to pierce the corporate veil: (1) equity; (2) alter ego; and (3) instrumentality. These theories are defined and examined at length in *White v. Winchester Land Development Corp.,* 584 S.W.2d 56 (Ky. Ct. App. 1979).

In the instant action, Plaintiffs rely upon the alter ego theory, contending that Cardigan's separate corporate existence was not sustained. Whether a corporate veil should be pierced based upon "alter ego" depends upon the particular case. *Id.* at 62. It is recognized and applied where there is a combination of "(1) undercapitalization; (2) a failure to observe the formalities of corporate existence; (3) nonpayment or overpayment of dividends; (4) a siphoning off of funds by the dominant shareholder; and (5) the majority shareholders having guaranteed corporate liabilities in their individual capacities." *Id.* The theory requires proof of unity of interest and ownership between the corporation and its owners and that adhering to the normal corporate attributes of separate existence would

-33-

sanction a fraud or promote injustice. *Id.* at 61-62.

Though Plaintiffs rely upon this theory in an effort to hold Welsh personally liable for the debts of the corporation, they fail to bring forth sufficient evidence to raise a genuine issue of material fact on this theory, instead relying upon conclusory statements such as "Welsh's conduct throughout demonstrates that there was no line between his company and private affairs." Southern Appalachian references the testimony of former Cardigan employee Violet Hester, whose employment with Cardigan terminated in the spring of 2004. Plaintiffs cite to her testimony that during the last year of her employment, Welsh would have money transferred from his business accounts into his and his wife's personal checking account. This general testimony, though, does not evidence a co-mingling of business and personal activities that would reasonably support a conclusion that the corporate entity was disregarded. Southern Appalachian also cites to a letter sent by Welsh to his prior counsel, arguing the letter essentially serves as an acknowledgment by Welsh of the intertwining of his personal and business accounts. In reply, however, Welsh points out that this letter directed to his counsel was actually questioning the intermingling of personal and business information by credit agencies in postings to his personal credit report. This communication does not serve as evidence to support an inference that Welsh was disregarding the corporate entities he had formed by co-mingling personal and corporate funds.

Southern Appalachian also refers to a personal guarantee given by Welsh to First Capital, Cardigan's factoring company. Plaintiffs do not, however, point to any evidence of personal guarantee by Welsh for the coal purchase transactions between Cardigan and Plaintiffs. Finally, it is curious that Southern Appalachian also points to Welsh's pay down

-34-

on Cardigan's debt to Southern Appalachian "long after" Cardigan went "belly up" as somehow evidencing alter ego. It is difficult to comprehend how Welsh's after-the-fact attempts to reduce the account balance via personal payments, whatever the motivation, would serve as evidence of his disregard of the formalities of corporate status during the relevant time period when Cardigan and Carcoal were viable, operating entities. Accordingly, the Court finds that Plaintiffs have failed to provide a factual basis to raise an issue as to whether the corporate veil of Cardigan should be pierced and Welsh subjected to liability personally for the debts of his failed business.

### G. *Punitive Damages*

Plaintiffs also seek punitive damages (Count XV). They have set forth their request for such damages in a separate claim of their Complaint and Intervening Complaint. Given the Courts' conclusion that summary judgment in Defendants' favor on all of Plaintiffs' claims against them is in order, Plaintiffs' claim for punitive damages cannot be supported and therefore is also denied.

### III. CONCLUSION

At its core, this case is a collection action, brought by two coal suppliers who ended up on the shorted side of a broker's balance sheet. In an effort to cure those losses, Plaintiffs pursued possible alternative avenues using innovative application of legal theories, which of course is fair for them to do. But at the end of the day or, in legal parlance, the conclusion of discovery, Plaintiffs have been unable to establish at least one viable legal theory against each of the Defendants or, to the extent they have demonstrated one, have been unable to establish that facts material to that theory are genuinely in dispute.

Accordingly, for the reasons stated herein, **IT IS ORDERED** that:

(1)     Plaintiffs' Objections to the Magistrate Judge's Order denying Plaintiffs' Motion to Compel production of SARs (Doc. #87) are hereby **overruled;**

(2)     Defendant Cook & Sons Mining Co.'s Motions to Strike (Docs. #117 & #122) are hereby **denied;**

(3)     Defendant Teresa Gillum's Motion for Summary Judgment (Doc. #102) is hereby **granted;**

(4)     Defendant Citizens Bank of Northern Kentucky's Motion for Summary Judgment (Doc. #103) is hereby **granted;**

(5)     Defendant Charles Welsh's Motion for Summary Judgment (Doc. #104) is hereby **granted;** and,

(6)     This action is hereby **dismissed** and **stricken** from the active docket of this Court.

A separate Judgment shall be entered contemporaneously herewith.

This is a final and appealable order.

This ___30th___ day of September, 2008.

**DAVID L. BUNNING, JUDGE**
**UNITED STATES DISTRICT COURT**

G:\DATA\Opinions\05-204-Opinion&Order.wpd